# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
## (Case No. 18-55169)

---

JAMES E. ANDREWS,
Individually and on behalf of all others similarly situated,

Plaintiff/Appellant

v.

SIRIUS XM RADIO, INC., DOES, 1-100 inclusive,

Defendants/Appellees

---

## APPELLANT JAMES E. ANDREWS' REPLY BRIEF

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA,
HONORABLE PERCY ANDERSON, PRESIDING
Case No. 5:17-cv-01724-PA-AFMx

**LAKESHORE LAW CENTER
JEFFREY WILENS (State Bar No. 120371)
18340 Yorba Linda Blvd., Suite 107-610
Yorba Linda, CA 92886
(714) 854-7205
(714) 854-7206 (fax)**

**Attorney for Appellant James E. Andrews**

# TOPICAL INDEX

TOPICAL INDEX   I

TABLE OF AUTHORITIES   II

ARGUMENT   1

I.   SUMMARY JUDGMENT SHOULD HAVE BEEN DENIED BECAUSE THE COURT CANNOT FIND AS A MATTER OF LAW THAT A PERSON IS LIABLE UNDER THE DPPA ONLY IF HE OBTAINS PERSONAL INFORMATION DIRECTLY FROM A STATE DEPARTMENT OF MOTOR VEHICLES RECORD, BECAUSE A DRIVER LICENSE IS A MOTOR VEHICLE RECORD AND BECAUSE THERE WAS A TRIABLE ISSUE OF FACT WHETHER DEFENDANT ACCESSED DMV FORM 262 AFTER IT WAS SUBMITTED TO THE DMV.   1

     A.   THE EXPRESS LANGUAGE OF THE DPPA PERMITS LIABILITY TO BE BASED ON DISCLOSURE OF INFORMATION FROM A MOTOR VEHICLE RECORD EVEN IF IT WAS NOT OBTAINED DIRECTLY FROM THE DMV.   3

     B.   THE COURT OF APPEALS SHOULD APPLY THE STATUTE LITERALLY WHICH WOULD MEAN A DRIVER LICENSE IS A MOTOR VEHICLE RECORD AND SIRIUS IS LIABLE WHETHER IT GOT PLAINTIFF'S PERSONAL INFORMATION DIRECTLY FROM THE DRIVER LICENSE OR INDIRECTLY FROM A COMPUTER SYSTEM CONTAINING THE DRIVER LICENSE INFORMATION.   7

         1.   A DRIVER LICENSE IS A MOTOR VEHICLE RECORD.   8

         2.   SIRIUS IS LIABLE WHETHER IT GOT INFORMATION DIRECTLY

FROM PLAINTIFF'S DRIVER
LICENSE OR INDIRECTLY FROM A
DATABASE CONTAINING HIS
DRIVER LICENSE INFORMATION.                    10

    3.    INTERPRETING THE DPPA TO
IMPOSE LIABILITY UNDER THE
CIRCUMSTANCES OF THIS CASE
WOULD NOT PRODUCE ABSURD
RESULTS OR UNDERMINE THE
OVERALL STATUTORY SCHEME.              13

  C.  AUTHORITY IN THE NINTH CIRCUIT AND
IN OTHER CIRCUITS SUPPORTS
PLAINTIFF'S INTERPRETATION OF THE
DPPA.                                                          20

  D.  RULINGS SUPPORTING DEFENDANT'S
POSITION ARE NOT PERSUASIVE.              29

II.  SUMMARY JUDGMENT SHOULD HAVE BEEN
DENIED BECAUSE THERE ARE ADDITIONAL
THEORIES OF LIABILITY WHICH ANDREWS
SHOULD HAVE BEEN GIVEN TIME TO PLEAD
AND CONDUCT DISCOVERY ON.                        33

CONCLUSION                                                        37

## **TABLE OF AUTHORITIES**

### **CASES**

Collier v. Dickinson (11th Cir. 2007) 477 F.3d 1306 ................. 15
CoStar Realty Information, Inc. v. Field (D. Md. 2009) 612
    F.Supp.2d 660 ...................................................... 38
Creative Computing v. Getloaded.com, LLC (9th Cir. 2004) 386
    F.3d 930.................................................................. 38
Del Vecchio v. Amazon.com Inc. (W.D.Wash. Nov. 30, 2011,
    No. C11-366-RSL) 2012 WL 1997697 ....................................39
Eggen v. WESTconsin Credit Union (W.D. Wis., Aug. 16, 2016,
    No. 14-CV-873-BBC) 2016 WL 4382773 ........................ 28, 29

Ervin & Smith Advertising and Public Relations, Inc. v. Ervin (D. Neb., Feb. 3, 2009, No. 8:08CV459) 2009 WL 249998  38

Fontanez v. Skepple (2d Cir. 2014) 563 Fed.Appx. 847 ........... 18

Garey v. Farrin (M.D.N.C., Sept. 29, 2017, No. 1:16CV542) 2017 WL 4357445 .................................................................... 26, 27

Hatch v. Demayo (M.D.N.C., Sept. 29, 2017, No. 1:16CV925) 2017 WL 4357447 ......................................................... 26, 27

In re Hudson (9th Cir. 1988) 859 F.2d 1418 ............................... 8

In re iPhone Application Litig. (N.D.Cal. 2012) 844 F.Supp.2d 1040 ..................................................................................... 39

Maracich v. Spears (2013) 570 U.S. 48 ..................................... 14

Moncier v. Harris (Tenn. Ct. App., Apr. 5, 2018, No. E201600209COAR3CV) 2018 WL 1640072 ........................ 28

O'Brien v. Quad Six, Inc. (N.D.Ill. 2002) 219 F.Supp.2d 933 .. 33, 34

Pavone v. Law Offices of Anthony Mancini, Ltd. (N.D.Ill. 2016) 205 F. Supp. 3d 961 ................................................... 23, 24, 25

Pichler v. Unite (3d Cir. 2008) 542 F.3d 380 ........................... 15

Russell v. ChoicePoint Servs. (E.D.La. 2003) 300 F.Supp.2d 450 ........................................................................................ 14

Siegler v. Best Buy Co. of Minn. (11th Cir. 2013) 519 F.App'x 604 ........................................................................................ 31

Taylor v. Acxiom Corp. (5th Cir. 2010) 612 F.3d 325 ............... 14

United States v. Havelock (9th Cir. 2012) 664 F.3d 1284 ........... 8

United States v. Robinson (9th Cir. 1996) 94 F.3d 1325 ............. 8

United States v. Rrapi (9th Cir. 1999) 175 F.3d 742 ................... 8

Whitaker v. Appriss, Inc. (N.D. Ind. 2017) 266 F.Supp.3d 1103 ................................................................................... 19, 33

Wilcox v. Bastiste (E.D. Wash., June 9, 2017, No. 2:17-CV-122-RMP) 2017 WL 2525309 ............................................. 21, 22

Wilshire Westwood Assocs. v. Atlantic Richfield Corp. (9th Cir. 1989) 881 F.2d 801 .................................................................. 9

## **STATUTES**

18 USC § 1030 ......................................................................... 34

18 USC § 2721 ....................................................................... 3, 6

18 USC § 2722 ..................................................................... 3, 11

18 USC § 2724 ........................................................................... 4

18 USC § 2725 ........................................................................... 5

Appellant and Plaintiff, JAMES E. ANDREWS, by and through his attorney, Jeffrey Wilens, hereby respectfully submits this Appellant's Reply Brief.

DATED:  August 31, 2018

Respectfully submitted,

By _/s/_Jeffrey Wilens_____

JEFFREY WILENS
Attorney for Appellant

## ARGUMENT

**I. SUMMARY JUDGMENT SHOULD HAVE BEEN DENIED BECAUSE THE COURT CANNOT FIND AS A MATTER OF LAW THAT A PERSON IS LIABLE UNDER THE DPPA ONLY IF HE OBTAINS PERSONAL INFORMATION DIRECTLY FROM A STATE DEPARTMENT OF MOTOR VEHICLES RECORD, BECAUSE A DRIVER LICENSE IS A MOTOR VEHICLE RECORD AND BECAUSE THERE WAS A TRIABLE ISSUE OF FACT WHETHER DEFENDANT ACCESSED DMV FORM 262 AFTER IT WAS SUBMITTED TO THE DMV.**

In order to purchase a car at a dealership, Plaintiff presented his driver license to the dealer, who entered his personal information from the license into its dealership management computer system.  Subsequently, through devious means described in greater detail in the Opening Brief, Defendant Sirius XM "hacked" into the dealership's computer

system and retrieved Plaintiff's purchase information and his driver license information.

Plaintiff sued for a violation of the Driver Privacy Protection Act (DPPA), 18 USC § 2721 et. seq. Sirius argued, and the district court agreed, in granting summary judgment, that the DPPA did not apply because 1) a driver license is not a motor vehicle record and 2) even if it were, Sirius took Plaintiff's personal information off a computer system (in which the driver license information had been entered) and not off the license itself.

The court's ruling was flawed for several reasons and nothing in Respondent's Brief changes that: 1) the express language of the DPPA includes a driver license as motor vehicle record and permits liability to be based on disclosure of information from a motor vehicle record even if it was not obtained directly from the DMV; 2) a reviewing court must interpret an unambiguous statute literally unless doing so would produce absurd results or undermine the legislative intent, so the district court should not have twisted the law to avoid what it misperceived as absurd results; 3) Ninth Circuit

authority and persuasive authority from other circuits supports Plaintiff's contrary view; and 4) authority from other circuits cited by Sirius is distinguishable and/or unpersuasive.

**A. THE EXPRESS LANGUAGE OF THE DPPA PERMITS LIABILITY TO BE BASED ON DISCLOSURE OF INFORMATION FROM A MOTOR VEHICLE RECORD EVEN IF IT WAS NOT OBTAINED DIRECTLY FROM THE DMV.**

The first part of the DPPA, 18 USC § 2721, regulates the conduct of state DMVs. It restricts such state agencies from knowingly disclosing personal information or highly restricted personal information to any person except for a "permissible use." (18 USC § 2721 (a).) Subdivision (b) lists numerous permissible uses. As noted in the Opening Brief, Section 2721 is not pertinent to this lawsuit except for the permissible use section which is incorporated by other provisions of the DPPA.

18 USC § 2722 makes it unlawful for any person "knowingly to obtain or disclose personal information, from a motor vehicle record," except for a permissible use. This section is a general restriction on everyone and not just a state agency. While section 2721 (c) addresses the situation of a

person who obtains personal information from a motor vehicle record directly from the DMV, section 2722 imposes liability even in the absence of a direct disclosure by the DMV. Thus, subdivision (a) is not limited to persons who "redisclose" personal information from a motor vehicle record. It applies to persons who disclose the information in the first instance. That means they must have obtained the information somehow and not from the DMV (because if it was from the DMV it would be a redisclosure situation).

Much of Defendant's argument loses force when the foregoing distinction is kept in mind. Congress was addressing two different scenarios in the DPPA: the direct acquisition of personal information in motor vehicle records from the DMV and the indirect acquisition of personal information in motor vehicle records from other people (not the DMV).

The elements of the private cause of action are set forth in 18 USC § 2724, which makes a person who "knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter" liable for damages and civil penalties.

Thus, to establish liability, a civil plaintiff must prove that the defendant 1) knowingly obtained or used personal information; 2) that the personal information came from a motor vehicle record and 3) that the defendant did not have a permissible purpose for obtaining or using the information.

Liability in this case was actually fairly clear if the DPPA requirements had been correctly interpreted. As to the first requirement, it was undisputed that Sirius obtained Andrews' personal information insofar as it obtained his name, address and phone number. (18 USC § 2725 (3).) It was also undisputed that Sirius used the personal information to send the marketing letters and make marketing phone calls.

Turning to the second requirement, the district court found that Andrews' personal information did not come from a motor vehicle record for two reasons. First, it found a driver license was not a motor vehicle record. Second, it found that even if a driver license is a motor vehicle record, Sirius got the driver license information off the dealership's computer and not from the physical driver license.

Third, it was generally conceded at the summary

judgment hearing that Sirius had no permissible purpose in obtaining and using the personal information for marketing purposes. However, Sirius did offer a new argument for the first time on appeal, even though there was no factual support for it.

Sirius now claims summary judgment was properly granted because it had a "permissible purpose" for accessing Plaintiff's driver license information. Specifically, 18 USC § 2721 (b) (11) allows the **State** to disclose personal information from a motor vehicle record to anyone if the **State** has "obtained the express consent of the person to whom such personal information pertains." Further, a person who receives the personal information **from the State** with the driver's consent may redisclose for any purpose. (18 USC § 2721 (c).) Sirius reasons that the State disclosed Plaintiff's driver license to Plaintiff (presumably Defendant means when it gave him the license) and reasons this must have been with his consent. Defendant further argues that Plaintiff then redisclosed the driver license information to the dealership, which then redisclosed it to Sirius (even though it is factually disputed that

the dealership knew Sirius had a backdoor into its computer system). (Respondent's Brief, p. 26.)

The foregoing argument is absurd. Obviously (b)(11) applies to situations where a driver consents for the DMV to release personal information to others and not to the consumer himself. Equally, obviously the DMV never obtained "express consent" from Plaintiff to release his personal information to anyone. For that matter, Plaintiff did not give express consent for Auto Source to release his personal information to anyone either. This "consent" argument goes nowhere.

Therefore, the rest of this discussion of the DPPA will be focused on the only contested issues (is a driver license a motor vehicle record and is liability under the DPPA limited to situations where the driver license is obtained by the defendant directly from the DMV).

**B. THE COURT OF APPEALS SHOULD APPLY THE STATUTE LITERALLY WHICH WOULD MEAN A DRIVER LICENSE IS A MOTOR VEHICLE RECORD AND SIRIUS IS LIABLE WHETHER IT GOT PLAINTIFF'S PERSONAL INFORMATION DIRECTLY FROM THE DRIVER LICENSE OR INDIRECTLY FROM A COMPUTER**

**SYSTEM CONTAINING THE DRIVER LICENSE INFORMATION.**

If the language of a statute is unambiguous, the plain meaning controls. (United States v. Robinson (9th Cir. 1996) 94 F.3d 1325, 1328; United States v. Rrapi (9th Cir. 1999) 175 F.3d 742, 755; United States v. Havelock (9th Cir. 2012) 664 F.3d 1284, 1289; In re Hudson (9th Cir. 1988) 859 F.2d 1418, 1426.) It is not the job of a court to "rewrite" the law or look beyond the express language unless a literal interpretation "would thwart the purpose of the over-all statutory scheme or lead to an absurd result." (Wilshire Westwood Assocs. v. Atlantic Richfield Corp. (9th Cir. 1989) 881 F.2d 801, 803-804, citing Brooks v. Donovan (9th Cir. 1983) 699 F.2d 1010, 1011.)

1. A DRIVER LICENSE IS A MOTOR VEHICLE RECORD.

A "motor vehicle record" means "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." (18 USC § 2725 (1).) Therefore, a driver license is a motor vehicle record as is any other document pertaining to it.

However, the district court drew a distinction between a

record that pertains to a motor vehicle operating permit (aka driver license) and an operating permit itself. The court reasoned:

> Interpreting the statute as Plaintiff suggests and construing a "motor vehicle record" to include a driver license would render the definition's use of both "record" and "pertains to" as surplusage because the driver license would be "pertaining" to itself and ignore the requirement that is also be a "record." (ER, p. 9.)

The court was quibbling over nothing. By defining a motor vehicle record as something that pertains to (meaning is related to) a driver license Congress could not have intended to exclude a driver license itself. Adding the "pertains to" language does not rule out a driver license from being a motor vehicle record, but instead uses a license as an example while expanding the universe of records subject to the DPPA. A driver license is a certainly a motor vehicle record in itself, but the definition was intended to broadly sweep in any other document "pertaining to" a driver license as well.

For example, a printout of a driver license would be a record pertaining to the driver license. Partially redundant or

not, there was no legal justification to simply eliminate a driver license as a motor vehicle record. If that was Congress' intent, it would have expressly excluded a driver license.

Yet, under the district court's reasoning, if a stalker obtained a person's home address from a DMV printout containing the same information as found on the driver license, there would be liability under the DPPA. But if he ordered a duplicate driver license from the DMV to get the same information there would be no liability. What rational basis would Congress have had for allowing stalkers to obtain a printout of a driver license but not a DMV document containing information from a driver license? How would such a distinction address the fundamental purpose behind the DPPA?

Sirius tries to minimize this inconsistency by pointing out a stalker might be subject to liability under a different statute for fraudulent conduct if he ordered a duplicate license, but that is not convincing because the stalker may not have to make false representations to get the duplicate license. He could instead steal the duplicate from the victim's mailbox.

2. SIRIUS IS LIABLE WHETHER IT GOT INFORMATION DIRECTLY FROM PLAINTIFF'S DRIVER LICENSE OR

<u>INDIRECTLY FROM A DATABASE CONTAINING HIS DRIVER LICENSE INFORMATION.</u>

18 USC § 2722 makes it unlawful to "obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." Sirius argues the evidence showed it got Plaintiff's personal information directly from the database containing his driver license information and not directly from his driver license. However, the statute does not make it illegal "to obtain or disclose personal information from a motor vehicle record *that was obtained directly from the department of motor vehicles*." Sirius convinced the district court to rewrite the statute to add the italicized words.

On appeal, Sirius appears to be backing off this position to some extent. In its Brief, Sirius tries to recharacterize its argument:

> Sirius XM never argued, and the district court never held, that Sirius XM must have obtained personal information directly from the DMV to violate the statute. Instead, the district court held that the DMV "must be the source of the 'record'" from which the information ultimately derives. (Respondent's Brief, p. 31.)

Similarly, Sirius emphasizes "Sirius XM obtained the information at issue from Andrews' voluntarily provided driver's license. . .not from any motor vehicle record originally within the DMV's possession." (Respondent's Brief, pp. 37-38.) Sirius thus argues that the DPPA only prohibits a person from obtaining information directly from the DMV and it does not matter if he acquires personal information that came from a motor vehicle record presented by the driver to a different party, from whom Sirius got it. This revision does not advance Sirius' argument at all.

Sirius is confusing "origination" with "possession." A driver license is the property of the State of California and therefore the State of California Department of Motor Vehicles will <u>always</u> be the "original source" of the record. Andrews received his driver license from the DMV and never gave his driver license to Sirius.

However, in reality both Sirius and the district court imposed a "directly from the DMV" requirement, not an "original source must be DMV" argument. What Sirius really means by "source of the record" is not the person or entity who

originated it but the last person in the chain of possession of the record, which is the exact same argument as saying the DPPA only applies to personal information obtained directly from the DMV.

As stated above, the express language of the statute does not include a requirement that the defendant acquire the information on a motor vehicle record directly from the DMV.

Indeed, what would be the point of the knowledge requirement if liability were limited to the situation where the defendant acquired the information directly from the DMV? In that case, the defendant would always know it received motor vehicle records. The knowledge requirement is put into place to protect a defendant who purchases or acquires personal information from a third party (not the DMV) and did not know the information was based on motor vehicle records.

3. <u>INTERPRETING THE DPPA TO IMPOSE LIABILITY UNDER THE CIRCUMSTANCES OF THIS CASE WOULD NOT PRODUCE ABSURD RESULTS OR UNDERMINE THE OVERALL STATUTORY SCHEME.</u>

One major goal of the DPPA was to protect consumers from disclosure of sensitive information contained in motor vehicle records. (<u>Maracich</u> v. <u>Spears</u> (2013) 570 U.S. 48, 57;

Taylor v. Acxiom Corp. (5th Cir. 2010) 612 F.3d 325,336; Russell v. ChoicePoint Servs. (E.D.La. 2003) 300 F.Supp.2d 450, 45; Pichler v. Unite (3d Cir. 2008) 542 F.3d 380, 388; Collier v. Dickinson (11th Cir. 2007) 477 F.3d 1306, 1310).)

A citizen suffers the same harm to his right of privacy and personal safety when his personal information contained in motor vehicle records is transmitted directly from the DMV to a marketing company as he would if the information was given by the citizen to one company for one purpose and then improperly transferred to an unrelated company for a different purpose. Information compromised is information compromised. If, at the end of the process the party in possession of the private information does not have a permissible purpose for possessing it, then the overall statutory scheme should give the citizen legal recourse. Therefore, Plaintiff's interpretation does not undermine the statutory scheme.

Nor would a literal reading of the statute produce absurd results. It is Sirius' reading that would produce absurd results because a defendant would avoid liability for accessing personal

information in motor vehicle records merely acquiring it from third parties and instead of the DMV.    Sirius argued, and the district court agreed, that the DPPA only limits disclosure of personal information when it is disclosed directly by the DMV. If the exact same information is disclosed on a driver license issued by a DMV, the statutory protections do not apply.  That does not make any sense.

Treating a driver license as a motor vehicle record would not trigger the parade of horribles envisioned by Sirius.  One supposedly problematic scenario is that of the Good Samaritan who finds a lost wallet and uses the name and address found on the driver license in the wallet to return the wallet to its owner. Supposedly this innocent act would trigger criminal and civil liability.

The Good Samaritan scenario is a straw man argument because it simply reflects the reality present in many circumstances where a person might otherwise be civilly or criminally liable for conduct, would be exempt from liability. Sirius wants the court to focus on hypotheticals that don't relate to real life and ignore bad things that really do happen, but

which would be perfectly legal under Sirius' interpretation of the DPPA. There is no reason to believe anyone would be prosecuted for a violation of the DPPA for opening a wallet to look at the owner's address on his driver license so as to return the wallet, any more than there is any reason the person would be charged with possession of stolen property if the wallet was stolen by someone else and then discarded on the street.

Moreover, as pointed out, the use of this scenario proves too much. Sirius posits it is necessary to exclude driver licenses from constituting motor vehicle records to avoid affixing liability to "innocent conduct." But what if the Good Samaritan found a lost briefcase full of official DMV records including those of the owner of the briefcase? Presumably, everyone would agree that the Good Samaritan who knowingly used a motor vehicle record to identify the owner in these circumstances did not break any law. Thus, the problem of the Good Samaritan cannot be "defined away" by excluding driver licenses from the definition of motor vehicle records.

Instead this scenario is simply a subset of many scenarios that might trigger the Good Samaritan doctrine—a principle

that exempts persons from liability in numerous situations where liability might otherwise be triggered. The solution to obscure scenarios such as the hypothetical presented by the district court is to apply principle such as the Good Samaritan doctrine rather than twist the law. Meanwhile, Sirius want to deflect attention away from what it did do in this case. It got ahold of Plaintiff's driver license information by hacking into the dealership's computer system. That's a bad thing Sirius wants the Court to ignore.

Sirius cites <u>Fontanez</u> v. <u>Skepple</u> (2d Cir. 2014) 563 Fed.Appx. 847, 848, which posited another example of an "absurd result" that would supposedly occur if a driver license were viewed as a motor vehicle record. In the court discussed the following scenario: a woman visiting her boyfriend in jail presented her driver license as proof of identity to the guard. The corrections officer noted her address and later sent her a "teddy bear" from her "new admirer." Supposedly imposing liability on this creep would be an absurd result, but that is certainly debatable.

In any event, there is a big distinction between the guard

using the information that was voluntarily submitted to him and a third party who was never given any kind of consent to use the information. In the instant case, Andrews did not sue the dealership to whom he gave his driver license to purchase a car. He sued Sirius which hacked into the dealership's computer to obtain the information from the driver license.

Another supposed example of an absurd result concerned a person who "uses information on her spouse's driver's license information to make an order or reservation" and therefore "would be liable to the spouse for a DPPA violation." (Whitaker v. Appriss, Inc. (N.D. Ind. 2017) 266 F.Supp.3d 1103, 1109, dismissed (7th Cir., Nov. 8, 2017, No. 17-2679) 2017 WL 7689606.) But presumably the spouse acted with consent in using information from the driver license to make a purchase. There is no liability for using a driver license to make a purchase as the spouse would be acting as an agent of the licensee.

On the other hand, let's imagine the spouses were estranged and the husband stole his wife's driver license to make a purchase for himself without her consent. In what way

would it be absurd to prosecute the husband for a violation of the DPPA?

Another example of an "absurd result" according to Sirius pertains to the fact the court docket in this case now contains a partially redacted picture of Andrews' driver license. According to Sirius, this means that "anyone obtaining that information for a purpose not qualifying for a statutory exception would—under Plaintiff's theory—violate the statute." (ER, p. 71.) No, such persons obviously would not be violating the statute as Plaintiff would have waived any privacy expectations to the extent he consented to publication of his driver license into the court record. On the other hand, if someone stole Plaintiff's wallet so they could have look at his driver license to discover his address, that would be a violation of the DPPA.

In its brief, Sirius offers another example of an "absurd" result.

> Imagine you check into a hotel and hand over your driver's license when the clerk asks for your contact information. If the hotel later mails you a survey asking about your stay, it has committed a crime, and you may sue it for $2,500.

This scenario does not follow from literal application of the

DPPA. The hotel guest voluntarily turned over his contact information, so the hotel could "contact him" if necessary. There is no crime when the hotel subsequently does so. Now if the hotel sold the contact information to an unrelated company that contacted the guest for its own purposes, that would be a crime and should be a crime.

### C. AUTHORITY IN THE NINTH CIRCUIT AND IN OTHER CIRCUITS SUPPORTS PLAINTIFF'S INTERPRETATION OF THE DPPA.

The most pertinent Ninth Circuit authority is <u>Wilcox</u> v. <u>Bastiste</u> (E.D. Wash., June 9, 2017, No. 2:17-CV-122-RMP) 2017 WL 2525309, at *2.) That case involved the legality of selling accident reports that contained personal information about the drivers that was obtained from motor vehicle records. It is not fully clear from the decision whether it was driver licenses that were used to gather the information or DMV printouts of driver license information. Also, since this ruling was one granting a preliminary injunction the discussion of the likelihood the plaintiffs would prevail was not a final ruling.

Nevertheless, the district court in <u>Wilcox</u> rejected at least one of the arguments made by Sirius in the instant case—that

the DPPA only applies where a defendant has obtained information directly from a department of motor vehicles.

> In other words, WSP appears to argue that the DPPA protections do not apply to the information when that information is conveyed to a third party. . . .Although Defendants' proffered interpretation of the DPPA has received some support in case-law, . . .it appears to conflict with the plain language of the DPPA considered in context. Taken together, the DPPA's provisions seem to protect personal information if the original source of that information is a DMV database. (<u>Id</u>. at p. *2.)

Sirius argues the case is not on point because the original source of the personal information it obtained about Plaintiff was from his driver license "not from any motor vehicle record originally within the DMV's possession." (Respondent's Brief, pp. 37-38.) Sirius is mistaken. As stated previously, Plaintiff's driver license <u>was</u> originally within the DMV's possession.

Leading cases from other circuits that support Plaintiff's position are discussed below.

In <u>Pavone</u> v. <u>Law</u> <u>Offices</u> <u>of</u> <u>Anthony</u> <u>Mancini,</u> <u>Ltd</u>. (N.D.Ill. 2016) 205 F. Supp. 3d 961, the plaintiff was involved in a car accident and was required to produce his driver license to

the investigating officer at the scene.  The officer recorded his personal information from the driver license onto the crash report.  (Id. at pp. 962-963.)  Subsequently, a third party was permitted by the police to publish accident reports on its site.  A trolling personal injury lawyer purchased the report and mailed a solicitation letter to the plaintiff, who sued the lawyer under the DPPA.

The court upheld the DPPA claim.  First, the court agreed that the information recorded (including the driver's name) was personal information under the DPPA.  (Id. at pp. 963-964.)

Second, it agreed that § 2724 must be read literally. While § 2721 limits liability to state DMVs or persons who acquire information directly from state DMVs, § 2722 and § 2724 are not so limited.  The court noted that given the wording of the statute, "even if a document is created by the police, the DPPA protects any information in the report that the police obtained from the motor vehicle record."  (Id. at p. 964.)

Along the same lines, the court made this excellent point:

> [T]he Court sees no appropriate basis in the language of the statute to read the term "from a motor vehicle record" to limit liability to situations involving

disclosure or use of personal information that the defendant himself got directly from a state department of motor vehicles. Among other things, were this the case, there would be no need for section 2724(a) to limit liability to persons who "knowingly" obtain or use personal information from a motor vehicle record—because a person who gets the information directly from a state agency quite obviously knows that is where he is getting the information. (Id. at p. 965.)

Third, the court agreed that "information obtained from a driver's license is information obtained from a motor vehicle record." (Id. at p. 966.)

This case matches up with the facts of the instant case. Here, Andrews produced his driver license because it was required to buy the car. Information off his driver license (as well as off another DMV form) was put into Auto Source's DMS. There is a dispute concerning whether or not Sirius XM acquired the information off the DMS with the dealer's consent or stole it. In any event, just like the personal injury lawyer in Pavone, Sirius XM then aggressively trolled Andrews to sign up for Sirius' subscription radio service.

Sirius asks the Court to rejecting the reasoning in Pavone

based on the "pertains" to motor vehicle record language and because of the "absurd" results that would supposedly result from deeming a driver license to be a motor vehicle record.

Additional supporting authority is found in <u>Garey</u> v. <u>Farrin</u> (M.D.N.C., Sept. 29, 2017, No. 1:16CV542) 2017 WL 4357445 and its companion case <u>Hatch</u> v. <u>Demayo</u> (M.D.N.C., Sept. 29, 2017, No. 1:16CV925) 2017 WL 4357447. The lawsuits were brought by persons involved in motor vehicle accidents. As part of the police investigations of the accidents, the officers reviewed the driver licenses and recorded the information onto the accident reports. The defendants, local law firms, purchased the accident reports and then mailed advertisements for their legal services to the accident victims identified in the reports. (<u>Garey</u>, 2017 WL 4357445, *1-2; <u>Hatch</u>, 2017 WL 4357447, *1-2.)

The law firms moved to dismiss raising arguments similar those raised by Sirius. In rejecting those arguments, the district court made the following points:

The argument that the DPPA only applies to records directly provided to the defendant by a state DMV was rejected

because 18 USC § 2724 expands liability to any person who obtains motor vehicle records by any means. (Garey, supra, 2017 WL 4357445, *8; Hatch, supra, 2017 WL 4357447, *7.)

The argument that an accident report is not a motor vehicle record ignores the fact that the information from the motor vehicle record (driver license) is printed in the accident report. (Garey, 2017 WL 4357445, *8; Hatch, 2017 WL 4357447, *7.) Similarly, the record obtained by Sirius from the dealership's computer is not a motor vehicle record, but it did contain information from a motor vehicle record.

Sirius characterizes the analysis in these cases as dicta because it was also possible the personal information might have come from a DMV database. It is not dicta as the decisions clearly turned on the fact the information came from driver licenses recording into accident reports.

Sirius also asks the Court to disregard the reasoning in Moncier v. Harris (Tenn. Ct. App., Apr. 5, 2018, No. E201600209COAR3CV) 2018 WL 1640072, at *8, where the Tennessee appellate court interpreted a state statute that used the same definition of a motor vehicle record found in the

DPPA and found that a driver license was a motor vehicle record under that same definition. While that court was not deciding the precise question before this Court, it was simply interpreting the DPPA according to its express language.

Another case supporting Plaintiff's interpretation is Eggen v. WESTconsin Credit Union (W.D. Wis., Aug. 16, 2016, No. 14-CV-873-BBC) 2016 WL 4382773.) In that case, the credit union received a copy of the plaintiff's driver license when he applied for a loan. It subsequently published his driver license in a public court document. The credit union argued there was no violation of the DPPA because a driver license is not a "motor vehicle record" only records pertaining to a driver license, not the license itself, qualify as motor vehicle records.

The district court rejected this argument, which is the same argument Sirius makes. First, the court noted that the "pertaining to" language is meant to "expand the scope of the Act's coverage, so that a driver's information is protected not just with respect to a small list of the most obvious motor vehicle records, but any related records as well." (Eggen, supra,

2016 WL 4382773, at *3.)

Second, the court rejected the argument that liability turns on whether the driver license is directly provided to the offender by the DMV or by someone else. The court noted a record "a record is protected if it is 'issued' by the department of motor vehicles; it does not matter where the record is stored." (Id. at p. *3.)

Third, the court noted that while the Congress was concerned about dissemination of information directly from the DMV, the "broader goal was to protect the privacy of information included in documents issued by state departments of motor vehicles" regardless how the defendant got its hands on the documents. (Id. at p. *4.)

Further support for Plaintiff's position is found in an official opinion issued by the Indiana Attorney General on June 11, 2018 agreeing that a driver license is a motor vehicle record and liability can arise under the DPPA whether the personal information is taken directly from a driver license or from an accident report on which a police officer has written the driver license.

> Information obtained from a driver's license is information obtained from a motor vehicle record. . . .
>
> Thus, when a responding officer accesses personal information from a driver's license to complete the accident report, he is accessing a motor vehicle record. Any subsequent release of that report that includes the personal information and which does not fall under a DPPA exception violates the DPPA. Not only does the plain language of the statute support this conclusion, as the statutory definition of "motor vehicle record" expressly includes a driver's license, but a driver's license can only be produced by a state department of motor vehicles: it is an official record of that agency. This position fulfills the purpose and intent of the DPPA, which is to prohibit the disclosure-by a State BMV or any person-of personal information from a motor vehicle record. (2018 Ind.Op.Atty.Gen.No. 6, (June 11, 2018).)

The same Opinion concludes it would not make sense to exclude from the definition of motor vehicle record any document that is an actual motor vehicle record (registration, license, title). It also criticizes the argument that limits the DPPA to information obtained from a DMV database. The DPPA prohibits any person from obtaining or disclosing information from motor vehicle records, not just specifically the

databases maintained by the State. If Congress had intended to only prevent the disclosure of personal information from a state DMV database, then it would have used that specific language and not have broadly defined "motor vehicle record" as the prohibited source

### D. RULINGS SUPPORTING DEFENDANT'S POSITION ARE NOT PERSUASIVE.

Sirius relies on unpersuasive rulings from other jurisdictions. These were addressed in the Opening Brief. The leading case cited by Sirius is <u>Siegler</u> v. <u>Best</u> <u>Buy</u> <u>Co.</u> <u>of</u> <u>Minn</u>. (11th Cir. 2013) 519 F.App'x 604, which involved a retailer who scanned the customer's driver license information into its computer system when he returned a product. That court held that the DPPA did not apply because "the Act is concerned only with information disclosed, in the first instance, by state DMVs." (<u>Id</u>. at p. 605.) To the contrary, a plain reading of § 2724 does not require that the personal information from a motor vehicle record had been transmitted directly from the DMV to Best Buy. In any event, the case is distinguishable because the customer provided his license to support a refund request. While Best Buy scanned in the data, there is no

evidence anyone other than Best Buy saw or used it. By contrast, Andrews is not suing Auto Source to whom he gave his driver license in order to buy the car. He is suing an unrelated third party who accessed information from his driver license without consent and used it for an impermissible purpose.

The other main case relied upon by Sirius is <u>Whitaker</u> v. <u>Appriss</u>, <u>Inc</u>., <u>supra</u>. That court held that a company could sell accident reports even though the reports contained personal information scanned from the driver licenses of the drivers involved in the accident. Unlike the <u>Pavone</u> and <u>Garey</u>/<u>Hatch</u> courts, the <u>Appriss</u> court made an arbitrary distinction between information obtained from a driver license turned over by driver and information obtained from a record of the driver license held in the database of the state DMV. (<u>Id</u>. at p. 1107.) This distinction makes no sense. A driver license is the property of the state DMV. If it were otherwise, the State would not have the right to issue or confiscate it. What possible real difference does it make whether a picture of the driver license is downloaded from the DMV website as oppose to scanned in manually by the police officer who demanded the license be

produced by the driver?

Another case cited by Sirius is also similar to the instant one but with the same important distinction. In <u>O'Brien</u> v. <u>Quad Six, Inc.</u> (N.D.Ill. 2002) 219 F.Supp.2d 933, 933, the plaintiff gave his driver license to a nightclub attendant to gain entrance. The nightclub videotaped his license and entered the personal information into its computer system and then shared that information with another nightclub it owned. The court held the DPPA did not apply because "Defendants did not obtain plaintiff's information (his name and address) from a state motor vehicle agency. Plaintiff himself presented his driver's license to nightclub personnel as identification." (<u>Id</u>. at p. 934.) Again, that court erred because § 2724 does not require the personal information come "from a state agency." However, Congress was not just concerned with the conduct of the state; it was concerned with the privacy rights of the citizens and specifically addresses their privacy rights as pertaining to their driver license. One business indiscriminately sharing information from motor vehicle records with another business increases the risk of the information falling into the wrong

hands.

The O'Brien court rather simplistically stated that "Consumers who do not want private businesses to use their personal information can simply decline to disclose it and can refuse to patronize businesses that demand such information as a condition of service." (Id. at p. 934.) In the real world, consumers who want to open a bank account, purchase a car or do any number of other things have no choice but to produce a driver license or other state issued identification card. Moreover, if one business with a legitimate need to copy information from a driver license secretly transfers the information to a third party, how is the consumer supposed to know that is even happening?

This is an area of law where Congress wrote a clear statute, but many lower courts have arbitrarily castrated it. In as much as there is no binding United States Supreme Court or Ninth Circuit authority, this Court is free to exercise its own independent judgment, which should be tempered by the fundamental rule that a judge's function is to apply a statute as written and not to be a legislator.

In performing that function, this Court should issue a limited ruling holding that where a plaintiff can establish that a third party accessed a report (whether it be an accident report or dealership record of sales) containing information from a driver licensed issued by a state DMV, and where the third party did not have consent from the plaintiff nor was acting on his behalf, and where the third party used the information for marketing purposes, the plaintiff can state a claim for violation of the DPPA. Under such a limited ruling, the judgment must be reversed as there were triable issues of fact.

II. **SUMMARY JUDGMENT SHOULD HAVE BEEN DENIED BECAUSE THERE ARE ADDITIONAL THEORIES OF LIABILITY WHICH ANDREWS SHOULD HAVE BEEN GIVEN TIME TO PLEAD AND CONDUCT DISCOVERY ON.**

Plaintiff moved in timely fashion to amend the complaint to add a claim under the Computer Fraud & Abuse Act. If that claim were viable, then summary judgment could not have been granted.

The CFAA creates criminal liability for any person who, among other conduct, "intentionally accesses a computer without authorization or exceeds authorized access, and

thereby obtains . . . information from any protected computer." 18 USC § 1030(a)(2)(C).  To prevail in a civil action, Plaintiff would need to prove that he (and the class members) suffered a loss of at least $5,000 over a one-year period of time.  (18 USC § 1030(g), § 1030(c)(4)(A)(i).)

The CFAA defines "loss" as "**any reasonable cost to any victim**, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and **any revenue lost**, cost incurred, or other consequential damages incurred because of interruption of service. . ." (18 USC § 1030 (e)(11) (emphasis added).)

Sirius admits that the question whether Plaintiff "could have brought a viable CFAA claim turns on whether Andrews could plausibly allege a qualifying loss."[1]  (Respondent's Brief, p. 41.)

Plaintiff alleged that through computer hacking, Sirius stole valuable personal information about Plaintiff and many

---

[1]In a footnote, Sirius claims it had permission to rummage through the dealership's database, but that was disputed.

other persons, namely that that they had just purchased a particular vehicle equipped with a Sirius XM radio system, as well their contact information. Plaintiff alleges this recent purchase information constituted "hot leads" with a value in the advertising/marketing world was at least $100 per consumer.

However, Sirius insists the commercial value of the consumer information cannot qualify as a "reasonable cost," because that loss did not stem from any "interruption of service." Plaintiff argues the statutory definition of "loss" does not require the revenue loss arises from interruption of service. That is simply one way a loss of revenue can occur.

Sirius asks this Court to reject its own holding in Creative Computing v. Getloaded.com, LLC (9th Cir. 2004) 386 F.3d 930. In that case, a company was able to log into a competitor's website posing as a legitimate customer and obtain valuable information about its marketing practices. The Court upheld the CFAA claim against a similar argument and held that "loss of business and business goodwill" qualifies as economic damages recoverable under CFAA. (Id. at p. 935.) There was no interruption of service in that case.

Sirius also asks the Court to disregard two out-of-circuit decisions as being unpersuasive. See also, <u>Ervin</u> & <u>Smith</u> <u>Advertising</u> <u>and</u> <u>Public</u> <u>Relations,</u> <u>Inc</u>. v. <u>Ervin</u> (D. Neb., Feb. 3, 2009, No. 8:08CV459) 2009 WL 249998, at *9 (CFAA still applies where there is a loss of revenue even without physical damage to a computer or interruption of service); <u>CoStar</u> <u>Realty</u> <u>Information,</u> <u>Inc</u>. v. <u>Field</u> (D. Md. 2009) 612 F.Supp.2d 660, 675 (finding loss of revenue arising from unauthorized access to computer system qualified as damages under CFAA).)

Instead, Sirius asks the Court to rely on a line of cases rejecting that a generalized claim that loss of the marketing value of personal information constitutes economic loss under CFAA. (See e.g., <u>In</u> <u>re</u> <u>iPhone</u> <u>Application</u> <u>Litig</u>. (N.D.Cal. 2012) 844 F.Supp.2d 1040, 1068.) However, in those cases, the value was purely speculative because it was not linked to actual marketing activity. (<u>Del</u> <u>Vecchio</u> v. <u>Amazon.com</u> <u>Inc</u>. (W.D.Wash. Nov. 30, 2011, No. C11-366-RSL) 2012 WL 1997697, at *4.) In the instant case, there is a direct link between the acquisition of Andrews' time-sensitive personal information and the marketing activity. Andrews bought the

car on January 14, 2017 and Sirius sent the first targeted advertisement to him on January 16, 2017. Sirius mailed a total of 11 targeted advertisements and made 11 telemarketing calls through August 2017. This suggests the personal information had a verifiable marketing value, which was diminishing over time, and makes the loss concrete and not speculative.

Sirius characterizes the market value allegations as implausible because no company would pay $50 for a hot lead on a product that sells for $20/month. There is nothing inherently implausible about the allegations. Many companies pay money for leads even though it would take a number of months for the lead to pay for itself. Considering the effort Sirius made to convert Plaintiff into a paying customer and considering that Sirius already offers free months of service to new car owners there is nothing implausible about the marketing value allegations.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order granting summary judgment and denying the motion to amend.

DATED:  August 31, 2018

Respectfully submitted,

By _/s/_Jeffrey Wilens_____

JEFFREY WILENS
Attorney for Appellant

## **CERTIFICATE OF COMPLIANCE**

I, Jeffrey Wilens, do hereby certify the following:

Pursuant to the Federal Rules of Appellate Procedure Rule 32 (a) (7) (C) and Ninth Circuit Rule 32-1, the attached opening brief was prepared with Microsoft Word 2007, is proportionately spaced, has a typeface of 14 points or more and contains approximately 6,976 words (not exceeding 7,000) excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed this 31st day of August 2018 at Yorba Linda, California.

_/s/_Jeffrey Wilens_____

Jeffrey Wilens

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 31, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_____/s/__Jeffrey Wilens_____

Jeffrey Wilens